Good morning, Your Honor. John Frye for the Plaintiff. Aneela Ghouri. There's not much I can say that's not in our briefs, so I don't think I'll use the entire 15 minutes. In a nutshell, our position is that if you're going to deny a disabled person benefits, particularly one with a severe psychiatric illness, you should at least follow the requirements of the plan document. You should at least follow the requirements of the plan document. Well, didn't the plan document say that upon a request for a report, she had to answer as to her condition within 15 days? And actually, the document, the letter itself gave her 30 days, and she didn't answer under either the 15-day plan, or as you call it, the plan document rule, or the 30 days. Well, that's not correct, Your Honor. All right, correct me if you would. The plan document states that she must furnish this updated medical information reports and medical records within 15 days of the receipt of the letter. The letter that was sent to her said that she must comply within 30 days of the date of the letter. All right. Now, there's obviously a good reason for that in the plan, because when you're going to cut off someone's benefits who is disabled for failing to comply with this requirement, you ought to at least make sure that the beneficiary receives the letter. Well, so there was a 15-day period in the text of the letter for her to receive the letter. No, that's not correct. The letter that was sent to her on January 3rd only stated that she had 30 days from the date of that letter to respond. It did not make any mention of the plan requirement that she must respond within 15 days of the receipt of the letter. Is there some requirement that a request for medical update report not only give her 30 days from the date of the letter, but also advise her that the plan has a 15-day limit? Well, the letter is inaccurate and it's misleading. It doesn't tell her. Give her more time than the plan. Not necessarily if she did not receive the letter. And there's no. But she signed a receipt for the letter, right? The letter was sent January 3rd. She signed a receipt for it on the 17th, and she didn't respond until February 22nd. The receipt that was signed was a receipt that was dated February 17th, 2007. Somebody, we don't know who, crossed out the number 2 and wrote in the number 1. The letter that was sent to her, the January 3rd letter, did not state that the letter was being sent certified mail return receipt requested. And there is the defendant's did not keep the portion of the return receipt requested documentation from the post office that would have wedded the sending of the letter with the receipt. There's no credible evidence that that receipt that she signed was the receipt for the letter. They don't seem to rely on that point. It's in the brief. There's no evidence that she received this letter before February 8th when her claim was denied, or if she received it at all. When she got the denial, she wrote them back a letter, which explained all the difficulties in her life. And she stated that the letter was sent to a PO box, by the way. So your position was that there was no evidence submitted on the motion of summary judgment, much less any evidence which would remove any triable issue of fact, that she receives a letter at all, or that she received a letter before February 8th. Is that your position? Kind of. Well, she did respond to the termination letter. Yes. But that letter was sent. That letter stated you have 180 days from receipt of the letter to respond with an appeal. So it's very likely, since that letter said the time period begins upon the date of the receipt of the letter, that they sent that certified return receipt requested, because the initial letter says that she must respond within 30 days of the date of the letter. Now, the defendants are arguing that they can send her a letter, give her the wrong deadline to respond, and then come back and argue that she didn't respond within the right deadline, even though they never told her that deadline. But she didn't respond during the deadline given in the letter, either. Well, she didn't respond because there's no evidence that she ever got the letter. There's no credible evidence. Well, in the letter that she writes about, that they treat it as an appeal, she does say, I've asked my doctors to complete the form and provide the additional medical information that they've asked for. Yes, that was the letter that they wrote to her on February 8th denying her benefits. Well, so it looks like when they got that letter, the one they treat, they treat it as an appeal. Yes. As a second-level appeal. Yes, a first-level appeal. A first-level appeal. They treat it as a first-level appeal, and they said, hmm, in this letter you say that you were unable to respond. Or they, that you were having difficulties gathering information. You know, you just, they treat, it's like they look at it and they say, okay, well, it looks like you have an excuse here for why you didn't respond. Yes. And they say, we're going to investigate this. Yes. Right? Yes. What's wrong with that? Well, this is after the fact. They've already denied her, they've already denied her benefits. Well, let's just, let's assume for a moment that your argument on the timing doesn't, is not persuasive. Okay. So just assume, I mean, I don't know what, I haven't really, you know, I don't have any conclusions about this case yet because I find it very, you know, It's somewhat surprising that in the end she's about, if you give her the 30 days, she's about, what, 22 days late? Just from the, from the, if you give her the 30 days and once she got the notice of termination and whatnot, I don't know how many days it is, but it's about five or six weeks maybe? She responded after she got the, after she got the denial letter. Right. Now, how long, how many weeks is that? A few weeks. A few weeks after she got the denial letter. I mean the, excuse me. Yeah, the denial letter. Right. And it doesn't seem to me under the circumstances that, you know, that's all that significant. That's not significant? For the insurance company. I mean, they got the, they ultimately got the information that they were requesting, right? Absolutely. They got the information. Absolutely. And that's what's important. Absolutely. All right. But nonetheless, they do have these rules. Okay. So let's just assume for a moment that you're, that she didn't comply with the rule. Well, they get this letter and they say, ah, she's offering an excuse. We better check it out. Right? Yes. So what, what, where did they go wrong with that? Well, when you say they want to check it out, and that's, and, and I just use that, call it, you know. I really think that this, at that point in time, this file starts to stink. I mean, I think that they knew at that point in time they had a problem, because they knew that they gave her the wrong date, and they knew there was no evidence that she received that letter asking for additional information. So what they did was, I believe, is they went and hired this Dr. Friedman. And there's absolutely no conceivable reason for them to hire Dr. Friedman, unless they wanted to later, say in a later denial, oh, and by the way, you're not disabled anyway. No, wait a minute. They hired Dr. Friedman after your client had told them that she was unable, because of her mental condition, to respond to the earlier request. Yes, and that's the problem. So then they hired Dr. Friedman to say, why don't you examine this lady and tell us whether she was really unable to respond to our request. And he does examine her and says, I don't find any reason why she couldn't respond to your request. No, Your Honor, please. That is absolutely untrue. What is? Everything that you just said. They hired Dr. Friedman. They sent him a letter which said, we only want you to address the issue of whether or not in July of 2007 she is disabled from working. They never asked him to make a determination whether she had any cognitive deficits that would have precluded her from responding to the initial request. And that's important. He never was asked and was specifically not asked, and he never addressed that issue. Yeah. I think you're, I mean, that was, you know, I first read his letter, when I first read his opinion letter, I kind of thought, did they ultimately decide just to get to the merits of the claim and decide on the merits that she wasn't disabled? And I had to read the letter several times. And then you have to read the long final denial letter along with his letter. And it looked to me what they did was they said, well, we can infer from his opinions. We can infer from his opinions because he gives her these tests and they make some statements that Dr. Friedman kind of evaluates her performance on these tests. And it looks like what they did was they said, well, we can infer from this letter, from his opinions, that at the time, at the relevant time period here, that her cognitive ability was okay. She wasn't impaired to such an extent that she couldn't, that she couldn't respond properly to the letter. Well, why didn't they ask him to address that question? I don't know. I'm just saying it looks like that's what they, does that look like what they did? That's exactly what they did. Because when they got... I'm trying to figure out what's wrong with that. Because when they got his letter back, they were hoping to put in their final denial letter, and by the way, Ms. Gouri, you're not disabled, so we're going to deny you on this additional round. The problem with all that was that they sent Dr. Friedman the wrong definition of disability. So he even opined on the wrong disability standard. And as we all know, these doctors that are hired by insurance companies and plans, they know how to say this person is not disabled, and he equivocated in his report. And even though they told him just to address the issue of disability in 2007, the only reason or the only basis that they used that report in the final denial was that she wasn't cognitive. She had no cognitive deficiencies in January, so she couldn't respond. Now, if you're going to, I mean, we're talking about denying disability benefits to a severely, a woman with severe psychiatric illness. That's not fair. So we would have to conclude that it was arbitrary and capricious for them to do what they did in order to overturn their decisions. There is various levels of skepticism, of course. But you know what? There's an arrogance out there. Well, I mean, arrogance doesn't, I'm sorry to say it, but arrogance probably doesn't, I probably couldn't say arrogance equates to arbitrary and capriciousness. But these. You have to look at the record, and from the record you have to decide. You have to conclude that based on this record, they were arbitrary and capricious. Now, in your brief, you say, well, look, you know, it's good for the goose, should be good for the gandu, right? Because it comes to them, they could freely take extra time, all the time they wanted. And, in fact, they did take all the time they thought they needed in order to make their final decision. But when it came to her being 22 or whatever, how many days late she was, whether it was 22 days or six weeks, by goodness, we're going to hold her to the rule. And earlier in the fall of 2006, they had asked her, I mean, they keep on asking her to keep on submitting these medical reports and records. They called her when she, when they didn't get it. And they said, gee, Mrs. Gorey, can you supply this information? I mean, when they denied her in the February 8th letter, they never even called her. I mean, that's. All right. Anything else? Save your time. We'll give you some time for rebuttal. OK. Let's hear from the plan. Thank you. Good morning. May it please the Court. My name is Rick Potler. I'm from the law firm of Thompson-Coburn in St. Louis. And I had the privilege today of representing the appellees. It's my intent to divide my argument into three parts, to first talk about the standard of review, the second to talk about the material facts, and then to talk at the last about what I think is really the friction point here, and that is sympathy. Before getting to those points, though, I would commend to the Court Judge Hamilton's decision. I believe it's succinct. I think it's to the point. And I think it's square on to the issue she was asked to address by Ms. Gorey. And I think her decision on the law is absolutely correct. As I've read the appellant's brief, they seem now to suggest it may be something less than the arbitrary and capricious standard of review ought to apply. Just assume it's arbitrary and capricious. OK. Don't waste your time. OK. Then I'm going to go to the next issue, which is the timely fashion. I think that the appellant has done a masterful, though sometimes frequently questionable, job of fudging on the dates and the material facts. I want to go back and look at this. In September of 2006, her treating physician submitted an attending physician statement called an APS and said, I think this woman is going to be able to return to work, either the job she had before or after. And in order for her to do that, she had to have the right to asked for additional medical verification. There's no question about that. Yes. All records and continuing monthly or whatever, how many times, whatever the plan provided for her, they had a right to ask for that information. Yes. Let me ask you this, though. Under the plan, the way it operated, it seems like, you know, receipt, receipt of the request for the information was critical. I don't believe that's necessarily true. It is true under one provision, but not the other. So can we rewrite the plan to no longer say that receipt is the guiding point? Your Honor, there are two plan provisions in here. One says 15 days from receipt. Another section says the administrator has the right to request whatever information it requires, and there's no time limit there. So in the summary plan description that goes to the insured, the participant, what does it require? I'm not certain, Your Honor. It's not a part of the administrative record. We have the actual plan document. But it's a red herring, Your Honor. But what's in the summary plan description? I don't know, Your Honor, because it's not in the administrative record. We have the actual plan document. We didn't have the SPD in the plan document. So there are two different provisions that allowed the administrator to decide what he was going to do. Yes. Which course they were going to follow. Yes. And the district court cited both of those provisions, but it's a red herring, Your Honor, and here is why. Because we received a return receipt signed by Ms. Gorey dated January 17, 2007. And not only that, but the committee, or Reed, got that back and reported that they got it back on January 23, 2007. Now, the last letter that Reed had sent to Ms. Gorey before January 3rd was on October 26th. Uh-huh. Now, you say the committee reported back to whom? The committee in the administrative record, it is reflected that it received back the So. And that's in the record. Yes, sir. At what page? It is at the record, Your Honor, at the notes. 252. It is in the notes, January 23rd, certified receipt. And let me ask you this. You heard Mr. Frey suggest that the 1, indicating January, had been changed from a 2. Do you accept that suggestion? Your Honor, the 2 is Gratscot and there is a 1 above it. Yes, sir. But here's the point, Your Honor, is if that receipt was signed on February 17th, we couldn't have gotten it back on January 23rd. And the other thing, Your Honor, is the question is, based upon this administrative record, was it arbitrary and capricious to determine that she had received that form, that letter, on January 17th, when the administrative record shows a signature from her on January 17th, and the record shows that we got it back on January 23rd, and throughout the entire administrative proceedings, Ms. Gorey never contended that she had gotten that letter on any date other than January 17th. In fact, read the transcript in the district court, read the briefs in the district court, and Ms. Gorey never even contended there that she had received it at some time other than January 17th, 2007. So this is an argument made for the very first time on appeal, and it's made of whole cloth, because the record doesn't support that argument. In fact, based upon this administrative record, which we have, it would be arbitrary and capricious to conclude that she hadn't received it on that date. So regardless of whether you look at the plan provision that says 15 days from receipt or you look at that other plan provision that doesn't have a specific deadline, says the administrator has the request and they imposed a deadline of 30 days from the date of the letter, there's no suggestion that that provision or that 30-day requirement was arbitrary and capricious or unduly harsh. Regardless of which one you enforce, she didn't comply, because she didn't provide the documents until February 22nd, which was 36 days after the date of the letter. So how many days after her – when did she finally comply? When did she – February 22nd. We sent out the letter on January 22nd. So how many days late was she? She was 22 days after we had already denied the claim. Right. That she did. Now – 22 days. Yes. Let's talk about Dr. Friedman for a while. Yes, sir. Your colleague suggests that Dr. Friedman was asked to determine her disability, not her cognitive abilities, to answer the request for further information. Do you accept that suggestion? Yes. But – You have to accept that suggestion because it's pretty clear. Yes. And let me – let me say two things in that regard. When you look at the letter that was sent to Ms. Gorey, she was told we're going to get an IME in order to determine your cognitive ability. Right. That's what Richard McDonald, the pension committee representative, said when he wrote her. Somehow, the communication between him and when Reed wrote the letter, that got lost, and Reed simply sent the standard letter about whether she's disabled or not. But there's no hide. Why isn't that a waiver of her failure to respond by action, indicating that the insurance company admits that it can only terminate based on the merits? Your Honor, I have never seen a case that says that, and I don't understand why that would be the case. Well, why would they ask if she's disabled unless they intend to determine her disability or not? Well, based – I mean, her benefits are not based on disability rather than failure to report. Well, the straight answer is, Your Honor, when you read the letter that Mr. McDonald wrote to Ms. Gorey, he didn't say I'm going to try and find out if you're disabled or not. We're going to get an IME to determine whether your cognitive ability is as impaired as you contend that it is. Unfortunately, Dr. Friedman didn't answer that question directly. He did not answer it directly, Your Honor. He didn't answer it directly. But he – well, yes and no. He didn't think that's the question he was intended to answer. He didn't – he was never asked the question. That's right. He didn't answer it. He didn't answer the question. Well, but he said – The question that the insurance company determined – or not the – whoever, Reed determined was the critical question that they needed to have answered. Your Honor, he – That's what they told Ms. Gorey. That's what we need to know, and we're going to get an IME to focus on that question. And he conducted 16 tests, and he came back and said, this woman is not cognitively impaired. Okay. She has above-average intelligence. She performed the Tower of London test at the end of the day and did extraordinarily well. Okay. He was conducting that test on what day? Your Honor, it's about August the 9th. Okay. And they were really concerned with what period of time? February. And that's why I wanted to go through and tell you, Your Honor, that when you look at her own doctor's reports in October, November, and December, five days before we sent the letter, he wrote, no psychosis, no thought disorder, good judgment, insight good, normal mood, language normal. Three months in a row before that he had said that, and that's exactly the conclusion reached by Dr. Friedman in August. So there is no inconsistency. What about the doctor from – was it UCLA? Dr. Fusiner. Dr. Fusiner. Yes. He doesn't submit any test results. He doesn't say I've tested her cognitive ability. He just says, I understand you guys are denying her benefits and you're claiming she's not cognitively impaired. I think that she was. It certainly is not arbitrary and capricious for the committee to rely upon her treating physician who had seen her for months and months and months and who was telling them she had no thought disorder, her judgment was good, her insight was good, and the report of Dr. Friedman. Because Dr. Fusiner's report is, by the way, in April. It's not in February either. And there is no testing behind any of that to support it. So I have four minutes and 30 seconds left, and I'd like to talk about sympathy here, because I understand that. I'll tell you what. When I read this administrative record, and I've done this kind of law now for 30 years, read the administrative record, and I said if we lose this case, it's going to be because of sympathy. Because she is a sympathetic participant. But I also advise my clients. Well, you know, the problem is, is she's denied on the basis of this rule, this timing. Yes. If they had denied her on the basis of, okay, look, look, you know, 22 days, don't do it again. We're going to get to the merits. And on the merits, we've considered everything, you're no longer disabled. Right. That's an entirely different matter. Well, it is. And here they invoked a rule. Yes. Which apparently, in their own view of the world, is not really all that critically hard, because their rules, I mean, they do seem to have flexibility in the way they apply their rules. Well, I guess you're referring to the fact that they gave her more time at the outset, 30 days from the date of the letter. Yes, exactly. That might be your argument. And at the back end, on their end, they have less, they have flexibility. So, I mean, you know, in 22 days. Well, I'll tell you what, Your Honor, I advise ERISA fiduciaries all the time. And I tell them, you better enforce the terms of the plan, because that's your fiduciary duty. This wasn't Johnson & Johnson's money. It didn't contribute anything to this. This was the money of the employees of Johnson & Johnson. And we have a fiduciary duty to enforce the terms of the plan. And it's not to feel good. That's not what the law imposes upon us. It obligates us to adhere to the terms of the plan. And you might say, well, couldn't you have fudged in this instance? I mean, that's 22 days. Well, there's nothing in the plan that required you in this particular instance to get IME to evaluate whether she had the cognitive ability to do that. I agree. There's nothing in the plan that required you to do that. That's right. You had the plan administrator had discretion to do that. And they have – and there's nothing here that suggests that they don't have discretion to overlook the deadlines. No, Your Honor, that's not true. Where? Tell me where it says that in the plan. Well, where does it say that they can't? 30 years of ERISA cases. Where does it say in the plan that they can't? There is nothing in this plan. Doesn't it say in the plan that the plan administrator has discretion to interpret the plan? Yes. I don't see how 15 days from receipt is open to any interpretation. And if you say, well, we're going to close our eyes this time and let her have 22 additional days, is six months going to be okay? And what about the next participant who misses the deadline? We're dealing with this particular case. We're not dealing with any other case. Your Honor, I'm sorry, with all due respect, but that's not true because this fiduciary has to be consistent in its administration of this plan. And if we waive it for her, the next person is going to come in and say, aha, you're arbitrary and capricious. You waived this deadline for Ms. Gorey, but you're not doing it to me. So I assume for the next participant that comes in with a similar situation like this, the plan will go out and get an IME to determine whether or not the person had problems in time. I don't know. It probably depends on what basis the person claims for having missed the deadline. Mr. Potler. Yes, sir. Isn't there a tribal issue of fact for the administrator and perhaps for the district court judge, Judge Hamilton, in taking a look at that return receipt, which has a 2 crossed out and a 1 above it, and comparing that with the other record, a portion of the record showing that the committee received the return receipt on January 23rd? I mean, that entry of receipt of January 23rd is some evidence. It's water in your wheel. But the dating of the return receipt originally as February 17 would seem to contradict that entry. Isn't that a tribal issue of fact as to whether she actually received the letter in time? Well, Your Honor, two things. First of all, this point was never raised below. It was never raised in the administrative proceedings. This argument was never raised below. So it's an issue being raised for the first time on an appeal, and I don't think that's an appropriate thing to do. Second of all, Your Honor, the question is whether, based upon this administrative record, was it arbitrary and capricious to determine that she had received it on January 17th? And I don't think that there is any basis, because certainly Ms. Gorey could have submitted the letter and said, I never got this letter. I didn't get it on January 17th. And throughout the entire administrative proceedings, she never made that assertion, and she never made that assertion down below in the district court level. So for all of these reasons, Your Honor, we would respectfully ask the Court to affirm the judgment of the district court. Thank you. Thank you. The only time limit in the plan is the 15 days of receipt of the letter. Now, which provision are you relying on for that statement? And why did Judge Gorey decide that she had received the letter on January 17th? Hamilton thinks that there was another provision. Well, there's another provision talking about denial of benefits, but it's silent on time periods. It's just a general. But they pick 30 days in the letter. Why isn't that perfectly reasonable? Because the plan specifically states 15 days from receipt. Or the administrator can require information without any particular time date. I don't think that's what the plan says, Your Honor. All right. What does the summary plan description say? You know, I'm embarrassed to say we never got that. But that's what goes to the participants. Yes. You know, if you try to get a copy, it's the plan. It takes a lawyer to get a copy of the plan. Yeah. They're not readily available. But the evidence of whether or not she received this letter is really a problem. I mean, for instance, counsel says there's a log entry that says they received the return receipt requested in January. Well, that's not what the lock note says. It just says two words, return receipt. I wonder what that means. Was it ever argued in a district court that it means something else? No. Okay. Was it ever argued in the administrative proceeding? No. Okay. But here's really my point. If you're going to deny, cut off this woman's disability benefits, don't you have to have really solid, undisputable facts? No. We have to review the administrative record on an arbitrary and capricious basis. You're talking to a jury.  Maybe that's the same thing, Your Honor, in my mind. It's arbitrary and capricious to deny these benefits unless the evidence is solid and uncontroverted. Thank you very much. We do appreciate your argument. And interesting case, and the matter is submitted at this time. Thank you.
judges: Duffy, Paez, Bea